Our third and final case, Corey versus Secretary of Housing and Urban Development, number 12-2239, Mr. Holroyd. We'll be glad to hear from you, sir. Good morning, gentlemen. My name is Fred Holroyd, and I represent Michael Corey in this appeal and cross-petition for enforcement. The background of this case basically is that Ms. Walker made an effort to rent a house from Mr. Corey. She advised him in her first face-to-face meeting that she had a severe autistic brother, Mr. Corey being not particularly overly educated in that particular field. This raised a question in his mind as to what severe autism meant, so he said, I'd like to meet your brother. Part of his program in renting houses, and he has 15 or 18 at this time, part of his program in renting houses was to meet and get an application from all of the adults that lived in his house. Ms. Walker's brother, Gregory, was an adult and, of course, was to live in the house. He gave her an application and asked her to fill it out. He asked her whether or not her brother was, whether she could get a doctor's statement stating whether or not her brother would be a danger to the community. His house was next door to some small children. Did he ask whether or did he demand a statement? I don't think he ever got to the demand stage. What he said was, I would like to have a doctor's statement to this effect, but he also said, if I meet your brother or if I get the doctor's statement, we won't have any problems. I think probably, and not being naive as Ms. Walker was, she probably would construe that as a demand that she wanted a doctor's statement. While we're on the subject of naivete and lack of sophistication or education, I think you mentioned that you at least suggested that your client may not have been as sophisticated as might be ideal in these circumstances. That's not a defense, is it? Well, the statute provides that an individual does not have an obligation to rent to someone who would damage their property. And somewhere along the line, if you have a suspicion or something that would indicate that there is a potential of damaging your property, in order to meet that standard, logic would tell you that you should be entitled to do at least a preliminary investigation to make a determination as to whether that person would be damaging to your property. And that's what Mr. Corey was attempting to do at that time. Of course, the problem with that is that the basis for him making any further inquiry was simply based upon this individual's disability and his limited knowledge of saying, well, I kind of know someone like this or who flails and may be disruptive. And that, from the Secretary's perspective, because what limits us is we could feel totally different about how this goes, but we're limited to our standard of review here in terms of what the Secretary did under the Administrative Procedures Act. So when we're dealing with it from a perspective that someone just based on their own belief, whether sophisticated or not, of a person's disability would create a different circumstance, that's, from my understanding, is where the Secretary went with this. And the question is whether there's evidence to support that. Well, there's more factors than that. I think if the Newtown, Connecticut incident where the fellow that borrowed his mother's weapons and shot up the school who was severe autistic, if that had occurred immediately before this, I think that we would not have an argument here that he would not have a suspicion that there was a basis for inquiring into whether or not there would be violence here. I'm trying to follow that example to understand the mere fact of knowing someone is disabled can lead you to have some caution in light of Newtown or even under these facts. Tell me what you're talking about, because I'm not understanding that analogy. What we're talking about is a disability, and the Act says you cannot discriminate against someone simply because they have a disability. When I talk about the fact that he actually saw this individual, he had any knowledge about his propensity, he just had one fact. He has autism. That's correct. And as a result of that, he then lays out these conditions that I don't think anybody else gets in terms of the $1 million bond. So I'm trying to connect. Help me with that and understand where you're going with that. Well, he was trying to determine whether this condition, this handicap I readily acknowledge is a handicap. He was trying to determine whether this handicap was a condition that would result in damage to his property. Now, if she had said he's autistic, I would totally agree with you, sir, that he would have no basis for making an additional suggestion or requirement that she get a $1 million insurance policy or a doctor's statement. I would totally agree with that. If she had just said he's autistic, so what did she say additional? She said he is severe autistic. Now, I asked her, I asked Ms. Walker, what do you think severe autism is? She says, I don't know. I said, can you define it? She said no. So she had lived with this fellow, and she couldn't define it. When I got into this case, I didn't know what the heck it was, and I couldn't define it. I'm not sure I could today. And the law allows a prospective landlord to conduct appropriate investigations of the suitability of a prospective tenant. Yes, sir. This includes, among other things, checking with the prior landlord. Yes, sir. Correct? Yes, sir. Did your client do that? He did not, and I will. He didn't even inquire, did he, into the prior living arrangement? For this simple. Beyond what? You're correct, Your Honor, for this simple reason. So why, go ahead. I'm sorry. No, go ahead. She was obligated, he handed her an application. He says, fill this out. Now, she did not fill the application out. She never applied for the job. I'm sorry. She never applied for the house. She did not fill out the application. Now, he testified, and everybody that testified in the situation, including her then current landlord, said that he would not lease a house to anyone who had not filled out an application. Now, she put this landlord on the witness stand, and I asked him that question, and that's what he said. Now, the application, according to Mr. Corey, what he did was he checked the person's employment, he checked their income, he checked their credit rating, he checked their criminal rating. Now, his checking of her credit indicated he did not get to check it because she hadn't filled out the application. If he had checked, as evidence subsequently produced, if she had checked his application, he would have determined that she had bad credit. I see you're going to the any other reason kind of defense. No, no, I was going to. I think your point is, or at least from my perspective, if instead of going into all of this about a $1 million insurance policy and a bond and a doctor's note, if when she advised him of her brother's disability, he had simply delivered the application to her, let her make all of these disclosures, then I suspect we wouldn't be here today. I totally agree with you, Jeff. And that's what the law contemplates will be the process. A person expresses an interest in renting a property, the landlord provides an application in writing, the form is filled out, the information is given to the landlord, and the landlord is free to conduct all of those investigations that you just listed. Credit, criminal background, insurance background, including prior landlords. He didn't do that. I understand that. And, Judge, if you look back on this case from this perspective, certainly that would have what I would have advised him to do. But he was spooked, if you will, by the characterization of severe autism. That's what the law is designed to prohibit, this spooking, merely by the use of a term connoting a disability. That's what the law is aimed at. I understand that, but the reality of the matter is, Judge, that he was concerned as to whether or not he would have subjected his property or his neighbors to damage, and he wanted to find out from her doctor. And Ms. Walker said it would have been a very easy thing, and she could have gotten this doctor's statement in a few days. But she decided not to do it. Because he spooked her. Well, I don't know whether she set him up or not, Judge. She could well have done that. There's no evidence that I know of that she did. You suggested she set him up? I said there's no evidence that she did. Do you think she really wanted to go through all of this? Pardon me? Are you suggesting to the court that? No, sir. Okay, I didn't think so. No, sir. No, sir. I was negativing that situation. But the fact of the matter is that he gave her the application. Had she completed the application, had he gone through his normal process of reviewing the application and making a determination as to whether or not she qualified for the rent, she did not have sufficient income to do this. She could not pass the criminal test, and she could not pass the credit test. But none of that excuses what happened prior to that process with respect to the claims in this case. If your client violated the law before any of this occurred and before this application might have been rejected, as you assume, it still doesn't excuse the statements that were made pre-application. And those were, I mean, that's predominantly what the Secretary was concerned about. I appreciate that, Your Honor. But the Secretary also referred to the McDonnell-Douglas standards, which is a Supreme Court case in the labor field that sets the standards for these type cases. And that is, first, that the individual is a protected person, which he was, whether or not they filed an application, which she did not. The third one, whether or not she was denied and whether or not there was a basis for doing that. So McDonnell-Douglas, in this case, was not followed. I think you look at the McDonnell-Douglas. I thought I had the citation on that, but I don't. Well, even with McDonnell-Douglas, do you get there if the Secretary has found there is direct evidence? McDonnell-Douglas kicks in when you're dealing with indirect evidence, which the Secretary alternatively found existed here. Then you get to show, well, it was a prima facie case. Then you get to shift the burden and you go, et cetera. Yes, sir. But when there is direct evidence, as the Secretary has found here, you don't do this burdenship on the McDonnell-Douglas. But still, Your Honor, under any standard, at least in my view of the law, under any standard you have to be in a position where you qualify for the rental. Somebody came in and said, well, I'm not employed. I don't have any income. I don't work. I don't do anything. But I want to rent the house. And that is correct. But the problem here deals with the particular sections in the regulations. And this conduct occurred pre-application. Yes, sir. And these alleged discriminatory statements were made then. That's the problem. And part of it, as I indicated earlier, part of the challenge that you have is the standard of review we are limited to. And that is we then look at what the Secretary has done, and we've got a very limited window of review, and that is whether it is supported by evidence. I understand.  We could agree with every word you're saying. But nonetheless, if that's supported by evidence, we're stuck with it. I understand that, Your Honor. But there's no question that the Secretary's stating the law was accurate. She certainly, the Secretary certainly stated the law. But she changed the facts of the case. An example is that she said that he made a condition that she agree to pay for any damages that occurred, and that was one of the conditions that she's held to be illegal. But as the Administrative Law Judge found, that was a condition that was standard in the applications that he required of everybody. I asked Ms. Walker, in her testimony, if she thought it was reasonable that a person be required to pay for the damages that occurred, and she said she thought that was reasonable. Yet the Secretary used that as one of the basis for denying or for ruling that he discriminated against her. Well, wasn't the Secretary looking at the totality of the circumstances of that early interaction between them? Of course, any tenant has to pay for damage. That's why we have security deposits. You interpret the record to mean that the Secretary singled out, without regard to the context, his statement to her that she was going to have to pay for damage occasioned by the residency of her brother in the property? That's not how I read it. That's what she said. What are you relying on in the record? Do you have a record citation? I think I can give you that record. Well, I thought I could, but I don't. Well, your client said, I mean, he wrote down, right, tenant to sign paper to be responsible for any damages caused by her brother. Yes, sir. That was all a part of the discussion about the brother, the autism, the danger. It wasn't just paying for damage caused by the tenant. It was damages caused by her brother. But that was a standard. That was a standard requirement in his contract with everybody. That's exactly the point. So if he had just given her the application and proceeded with a legal investigation, whatever lease document they eventually would have executed would have contained exactly that. So the question is, why was it necessary to even discuss that in advance of the completion of the application? I think that's what the Secretary is pointing to. I don't have an explanation as to why that was put in there, Your Honor. I can't give you that explanation, but I can tell you that it's a standard thing, and the Administrative Law Judge found it. That was in everybody's contract. That's undisputed. So it wasn't anything unusual, but still. But the Secretary, as Judge Wynn suggested to you, the Secretary, reading the Secretary's decision here, had a basis for inferring that this interaction, this initial interaction, was in the nature of an interrogarum interaction, to use your word, to spook her off. And he rented the place to a family that actually had less income than she did, according to one interpretation of the record. I understand he made this statement about the car and she had expenses for having a car. I don't know if that's true. Sometimes people who have a car spend less money on transportation than people who have to take public transportation. Or taxicabs. In addition to that, Your Honor, there was a $300 to $350 income that she claimed that she made off of the books. A lot of people do in terms of economics. I understand that. But part of his typical policy, and this was undisputed in the record, part of his typical policy was that he checked everybody's income, looked at their tax ticket to make sure that they were honest in telling him what the income was, and that he kept denying people rental if they didn't produce a particular amount of income. And that would have been perfectly proper in this case if he had permitted the application process to follow the ordinary course. One would presume. Yes, sir. Well, it's for those reasons, Your Honor, that we respectfully submit that the order should not be enforced. Thank you very much. Thank you, gentlemen. Mr. Holdroyd. We'll hear from the Secretary. May it please the Court, Christopher Wang on behalf of the Secretary of the Department of Housing and Urban Development. It would be remiss if I didn't open my remarks with a response to opposing counsel's invocation of Sandy Hook, which Judge Wynn had a question about. It's my position that this statement is just additional evidence that Mr. Corey doesn't get it. There have been plenty of crimes of gun violence that have been committed by individuals without disabilities, yet we don't assume that individuals with certain physical characteristics in common with those shooters are necessarily dangerous. Likewise, the Fair Housing Act prohibits assuming that individuals with autism are dangerous merely because Adam Lanza was dangerous. After learning from potential tenant Dolores Walker that she would be living with her brother Gregory, who is diagnosed with autism and mental retardation, Michael Corey did not subject Walker to only neutral and generally applicable requirements, such as providing references and answering permits. Opposing counsel said the problem is that when she said severe autism, that in and of itself was enough to trigger at least some type of response from the landlord. To have autism as one thing but severe autism would seem to have greater implications. How do you respond? I disagree, Your Honor. There's nothing in the statute of regulations that indicate that a potential tenant indicating that a disability is severe as opposed to just a general normal course of disability in any way affects the obligation of the landlord to apply only neutral and generally applicable requirements. So in this instance, I would assume that if Ms. Walker had not revealed this, and then would there be any opportunity for him to know this? I'm trying to understand. She revealed it to him for some reason. Why? She says she indicated in the record that she's very open with potential landlords, that she is caring for her brother, who is a grown man and has been diagnosed with autism and mental retardation. I think it's just a matter of her wanting to be fully upfront in disclosing the condition of her brother. That almost seems discriminatory in and of itself. That if someone is disabled, why do you need to tell someone that? Except when she adds the adjective severe to it, it's almost as if to alert him, alert the landlord, that I have someone who has severe autism. Well, the first point, Your Honor, that I'd make is that Ms. Walker is not a doctor, so whatever she says about her brother's condition being severe or not severe. I'm just trying to deal with it from Mr. Cora's perspective. Of course, you have the violations here. He's been found to have violated by the Secretary. But what is his – how does Educate MS – how does he respond to that? You're a landlord. You have property. You're about to rent it to a lady, and she says, I have a 48-year-old brother who has severe autism. And you say what? Okay and walk away. You say I would like to meet him. That's one possible resolution to the issue. Which was not done here. There's a factual dispute as to whether Mr. Cori asked to meet Gregory. Ms. Walker claims that he never asked to meet Gregory, and that if he had asked, she would have agreed. And, indeed, the record, she testified that she brought Gregory to several subsequent in-person tours. Would it be discriminatory to then investigate once you know a person has autism? Is it discriminatory to then conduct something special and do something different than you do with anybody else out there? It is, Your Honor, because it naturally assumes that someone – If he's going to say, I want to meet you, for what? To see what autism is about or to discriminate against him? To meet him to see what his condition is like. I think there were several people who testified that Gregory was a very gentle soul, and had he met Gregory in person, he would have seen that. That's part of – But I thought you told me it would be discriminatory for him to investigate. I would say, well, the point that I'm trying to make is that it's not discriminatory if you apply neutral and generally applicable requirements that you apply to all potential tenants. Say, if Mr. Corey had a requirement, I think he claimed this below and in the briefs, that he has a requirement that he meets all potential tenants before he leases any property to them. And if he had done that, then that would be permissible. That would not be a violation of the Fair Housing Act, and I suspect we wouldn't be here right now. What he did wrong was, after – Assuming his account of the story is correct and that he did ask to meet Gregory, is when he went beyond the request to meet and imposed these three discriminatory conditions that he related directly to Gregory's disabilities and imposed only on individuals with disabilities. That's where the violation of the Fair Housing Act came from. Well, but the landlord says, at least with respect to one of these, that the assumption of responsibility for damage is applied across the board. So how does the Secretary deal with that? Well, there's nothing in the record that indicates exactly what the assumption of responsibility states. One would have to wonder what's – But that – What is – That's fairly – I think, in my experience, fairly typical of leases that a tenant assumes – I mean, that's fairly obvious. You damage something, you're going to pay for it. Point taken, Judge Diaz. I would say one would have to wonder, if it didn't add anything to the lease, why would Ms. Jokori ask Ms. Walker to sign it? I also add that, in considering the totality of the circumstances, that in addition to this request for liability insurance and the request for a doctor's note, the assumption of responsibility was just sort of an additional insult to Ms. Walker, basically telling her that she would have to satisfy all these conditions to rent the property just because Ms. Jokori assumed that her brother was dangerous because of his disabilities. Well, the statute doesn't protect against insults, at least not generic insults. It protects against discrimination. That's correct, Your Honor. I think that goes toward her emotional distress she suffered. But, indeed, you are correct that as long as the conduct here has to be discriminatory or indicate a preference or limitation against individuals with disabilities, which I think that's very clear that the conduct in this case did. This is somewhat outside the record, but I'm frankly very curious. Does the Secretary operate a form of community mediation? One of the things that strikes me about this case is that it probably could have been resolved in a very healing, educative way under the right circumstances in the right community. Because, frankly, I suspect this kind of thing happens far more often than we would like to think. And I would like to think that not every time it happens it turns into a federal case, not that there's anything wrong with a federal case. But I'm just curious to know whether the Secretary, and I know the Civil Rights Division operates all kinds of community mediation and healing and kinds of processes that help people rise above their ignorance. And I say that with all respect, because people are ignorant about disability and differences. And there's a difference between ignorance and intolerance. And sometimes if we can address ignorance without specifically intending to, we end up addressing intolerance or suspicion or stereotyping. So, sorry for the long speech, but does the Department, either HUD or Civil Rights Division, take an approach that achieves those kinds of goals as well in these cases? Well, I agree completely with your sentiments, Judge Davis. I don't know for certain if HUD operates such a mediation program. I do know that as part of the injunctive relief, Mr. Coy was ordered to take some federal Fair Housing Act training courses. So I suspect that it might be part of that program that they might have. Yeah. Programs to – It could have happened at the front end rather than – I think that would have been preferable for all parties involved if that had happened at the front end. I suspect – obviously, Mr. Coy, from everything we see in the record, is a respectable businessman who is providing services and housing to people in the Charleston area, but I suspect that he felt a little insulted himself by the charges placed against him. Just a suspicion on my part. I suspect that as well, Your Honor. And so things perhaps break down when they take an adversarial posture, and that's too bad, but the law is the law, and sometimes education is more painful than it perhaps needs to be. I'd like to turn now to Mr. Coy, the opposing counsel. Before you do, I think dovetailing with Judge Davis is gone with that, because I think, you know, the practical effect of what we're doing here and what we're limited here really is driven by our standard of review here. So this court is fairly limited in terms of what it can do. As powerful as we can be on some things, when we're following the review of a secretary's decision, we can only – we've got to look at it in a light that does not give us a de novo look at this thing here. But, you know, if you go and you determine such a thing as what Judge Davis has indicated exists, it doesn't mean or preclude you can't do that now before this court issues something that, you know, it seems like if the parties here would get together and work this thing out, you could avoid what we're dealing with right now and perhaps even avoid whatever law might flow from here if there's an interest in that sort of thing. It just seems like all parties would be interested in that happening. And there may be a way to resolve it, and I'm sure you haven't precluded that. But I'm just saying if that exists before, I don't see why it can't exist now, given what we're dealing with here. This is not – it's an important case in so many respects, but, I mean, it's something that can be worked out between parties. Well, it would benefit all the parties except the lawyers, Your Honor. But I would say that things that are good for lawyers are not necessarily good for society in general. So I agree with that. It never comes down that you fail to settle a case because it doesn't benefit the lawyers. That's a sad statement on our profession if it ever comes down there. I agree, Your Honor. I'd now like to turn briefly to the financial qualifications argument that opposing counsel made. He did spend quite a deal of time on it. I think Judge Diaz correctly identified the error in this line of argument, which is that this is not a refusal to rent case. This is an imposition of discriminatory conditions. The conditions that are alleged to be discriminatory, Corey imposed those before he received an application, before he had any idea of how much money that Ms. Walker made. Because – as well, there's no defense in subsection C or subsection F to financial qualifications. Her ability to pay clearly could not have been a motivating factor. This is confirmed, I think Judge Davis brought this point up, by Corey's subsequent rental of the subject property to an individual without disabilities who, by all accounts, did not satisfy Mr. Corey's claimed monthly income requirements. Corey also can't invoke section 3604F9's direct threat defense to liability. He improperly based this defense upon blanket stereotypes of children with autism he claimed to have witnessed running around and, quote-unquote, flailing their arms and hollering and screaming in outrage, rather than any particularized concerns about Gregory, who's a 48-year-old man he never met. We find this comparison of children with a grown man not only to be inapplicable, but particularly insulting. To the extent that Corey was framing his statements as an attempt to obtain evidence to invoke subsection F9, he runs afoul of HUD's Fair Housing Act regulations, which prohibit a landlord from inquiring about the nature or severity of a handicap of a person who intends to reside in a dwelling after it is rented. The request for a doctor's note was clearly an inquiry into the nature and severity of Gregory's disabilities. The request that she purchase liability insurance went one step further and was an assumption that Gregory's disabilities were severe and rendered him dangerous. I'd now like to turn briefly, unless the panel has any additional questions about the liability issues, to the issues of relief in this case. Does he challenge that? He doesn't, but we are filing a cross-application for enforcement, so we'd like to be complete unless the panel would prefer me not to talk about damages. I think we understand your submission. Unless my colleagues have any questions, we understand your position. Okay. At this point, I'd like to answer any additional questions that the panel might have. Thank you very much, Mr. White. Thank you. Mr. Polroy, you have some time remaining, if you wish to. Thank you very much.
judges: Andre M. Davis, James A. Wynn, Jr., Albert Diaz